UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA URSUA-HOLMES,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　　Defendant. | Case No.: 1:15-cv-0843-JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF TERESA URSUA-HOLMS AND AGAINST DEFENDANT CAROLYN COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY |

Teresa Ursua-Holmes asserts she is entitled to benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating credibility of her subjective complaints. Because the ALJ failed to identify clear and convincing reasons to support the adverse credibility determination, the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. §405(g).

**PROCEDURAL HISTORY**

In 2012, Plaintiff filed an "application for a period of disability and disability insurance benefits, alleging disability beginning April 1, 2009." (Doc. 13-3 at 21) The Social Security Administration denied Plaintiff's applications at both the initial level and upon reconsideration. (Doc. 13-4 at 16, 30) After requesting a hearing, Plaintiff testified before an ALJ on September 16, 2013. (Doc. 13-3 at 21, 44) The ALJ concluded Plaintiff was not disabled and issued an order denying benefits on November 15, 2013. (*Id.* at 21-30) Plaintiff's request for review by the Appeals Council

was denied on April 16, 2015.  (*Id.* at 2-4)  Thus, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

The Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.   Relevant Medical Evidence[1]**

In November 2007, Plaintiff was injured while at work when she was squatting down "and a 30lb box of files fell and landed on her back." (Doc. 13-8 at 28)  An x-ray of her thoracic spine showed: "[1] Thoracic contusion; [2] sclerotic T9 bone lesion; [3] Thoracic Scoliosis; [4] L-45 Degenerative Disc Disease; [5] L4-5 Spondylolysis; [6] Osteopenia; [7] Facet arthritis; [8] Thoracolumbar pain; [9] Sacroilitis; [10] Muscle spasm; [11] bilateral upper and lower extremity paresthesias." (*Id.*, numbers in original)

Plaintiff had a "nuclear medicine bone scan" as well as MRIs on her thoracic and lumbar spines in February 2008. (Doc. 13-8 at 9-13)  Dr. David Fitzgerald determined Plaintiff had "increased activity in the lower lumbar spine and lumbosacral junction secondary to degenerative spondylosis" as well as "a small focus of increased activity in the right mastoid area." (*Id.* at 9)  In addition, the MRI of Plaintiff's lumbar spine showed "mild diffuse degenerative changes;" "mild deformity of the thecal sac associated with a combination of disc bulging, small marginal spurs, mild hypertrophy of the ligamenta flava and facets" at the L4-L5 level; and "mild to moderate deformity" at the L5-S1 level. (*Id.* at 10)  The MRI of the thoracic spine showed "lesions involving the vertebral bodies at T9 and T11 that [did] not appear to be active and exhibit[ed] signal characteristics suggestive of bone islands." (*Id.* at 12)

---

[1] The Court has reviewed the extensive medical record in this action. Due to the length of the medical record—which is more than 2,000 pages—this summary includes only the medical evidence referred to by either Plaintiff or Defendant in their respective briefs. (*See* Doc. 17 at 2-6; Doc. 21 at 5-6)

In April 2008, Plaintiff continued to report "generalized bodyache." (Doc. 13-8 at 29)  She described the pain as "6-8/10" on average. (*Id.*)  Plaintiff said she had "neck pain [that] worsened with movement," "numbness and tingling" in her left arm, and pain in her back that radiated to her left leg. (*Id.*)  Dr. Langlois observed that Plaintiff had a history of fibromyalgia, and a tender point "score of 14/18." (*Id.*)  Dr. Langlois recommended Plaintiff take "Lyrica for non-back related pain," and gave Plaintiff an epidural injection. (*Id.*; Doc. 13-9 at 76)

In October 2008, Plaintiff reported the epidural injection "was a horrible experience" and was not beneficial. (Doc. 13-9 at 76)  Upon examination, Plaintiff "ha[d] difficulty going from a sitting to a standing position," and had limited forward flexion. (*Id.* at 77)   James Jones, PA-C, noted Plaintiff "had no significant improvement in her condition" since January 2008. (*Id.* at 78) Plaintiff said she did not need additional medication, but requested a referral do a different pain management specialist, because she was "not a good fit with Dr. Langlois." (*Id.* at 77-78)

In December 2008, Plaintiff was evaluated by pain management specialist Dr. Ogorkiewicz, who recommended "selective nerve root blocks on the left L3, 4, 5 and S1 left side." (Doc. 13-9 at 58, 65)  Plaintiff continued to be "obviously uncomfortable going from a siting to a standing position," and had "diffuse palpable tenderness throughout the thoracolumbar spine." (*Id.* at 59)  The selective nerve root block was administered on January 13, 2009. (*Id.* at 88)

Mr. James evaluated Plaintiff in July 2009, and noted Plaintiff was taking "two Norco per day," as prescribed. (Doc. 13-9 at 30)  Mr. James believed Plaintiff's condition was "virtually unchanged," and she "seem[ed] to be in mild acute distress." (*Id.*)  He noted Plaintiff had "a history of depression," but did not believe her distress was caused by depression, because Plaintiff "just plain hurt[]" when moving around the examination room. (*Id.*)  Mr. James found that Plaintiff had "palpable tenderness throughout the lumbar spine without frank muscle spasm," and her "[r]ange of motion [was] somewhat restricted." (*Id.* at 31)

Plaintiff received a referral "for a psychiatric medication evaluation for depression and anxiety" in October 2009. (Doc. 13-13 at 48)  Dr. David Manno noted that Plaintiff's symptoms included "depressed mood, decreased interest or pleasure, feeling worthless, decreased sleep, decreased appetite, decreased concentration, decreased energy/ fatigue, feeling hopeless, low self-esteem and tearfulness."

(*Id.*)  Dr. Manno diagnosed Plaintiff with "depression, major, recurrent, moderate;" anxiety; and grief. (*Id.* at 50)  Plaintiff received prescriptions for Cymbalta, Buspirone, and Fioricet "as needed for headache." (*Id.*)

In December 2009, Plaintiff reported she had headaches, myalgias, neck pain, back pain, joint pain, and depression.  (Doc. 13-15 at 23)  Dr. Aquino noted that Plaintiff believed Tylenol with codeine helped "minimally," and Plaintiff was not abusing any substance.  (*Id.* at 23, 24)  According to Dr. Aquino, Plaintiff "exhibit[ed] tenderness and pain" in her shoulders and back, and tenderness in both hips.  (*Id.* at 24)  Her range of motion and strength were normal in her shoulders, hips, and back.  (*Id.*)  Plaintiff described her pain as "6/10."  (*Id.* at 23)

Plaintiff reported in February 2010 that she continued to be depressed and felt "sadness with lack of energy."  (Doc. 13-15 at 31)  She told Dr. Morga her medication was "not working well enough, and that she "heard that medications such as Abilify have been used to help treat depression." (*Id.*)  Dr. Morga prescribed Abilify to be added to Plaintiff's medicine regimen.  (*Id.* at 32)

In March and April 2010, Plaintiff continued to report pain in her neck, back, and joints.  (Doc. 13-15 at 40)  She "exhibit[ed] decreased range of motion, tenderness and pain" in her cervical and lumbar spine.  (*Id.*)  In addition, forward flexion continued to be "problematic" for Plaintiff, and she had "accentuated pain" with lateral flexion.  (Doc. 13-9 at 2)  Dr. Aquino noted Plaintiff was "intolerant to most opiates," and Plaintiff was "currently taking Excedrin with only partial control." (Doc. 13-15 at 40)  Due to the continued reports of headaches, Dr. Aquino referred Plaintiff to a neurologist.  (*Id.*)  However, Plaintiff did not obtain any relief after her neurology appointment.  (Doc. 13-18 at 49)

At appointments September and October 2010, Plaintiff reported her fibromyalgia symptoms were "moderately control[led] on current medications" and her pain was "stable."  (Doc. 13-18 at 35, 49)  Plaintiff reported she suffered from joint pain, headaches, depression, and anxiety.  (*Id.* at 35) According to Dr. Wong, conservative treatments were not helpful to Plaintiff.  (*Id.* at 36)  Dr. Aquino determined Plaintiff continued to have a "decreased range of motion, tenderness, and pain" in her cervical and lumbar spines.  (*Id.* at 49)

Throughout 2011, Plaintiff continued to report having anxiety; migraine headaches, which

could intensify to cause nausea; back pain, myalgias; depression; back pain; and joint pain. (*See, e.g.,* Doc. 13-19 at 30, 51, 65; Doc. 13-20 at 22) Plaintiff reported her headaches occurred daily, and began "in the neck or [felt] like a tight band around the temples, and [would] escalate as the day progresse[d]." (Doc. 13-19 at 30) She said Excedrin helped "her function through the day, but she [took] up to 7 or 8 pills a day." (*Id.*) Plaintiff received a Botox injection to treat her headaches, but later reported the Botox did not offer her any relief. (Doc. 14-1 at 7-8) In October 2011, Plaintiff reported her "neck and pain [had] escalated further," and she took "two of her husbands' hydrocodone/APAP every day." (Doc. 13-20 at 22) Dr. Benjamin counseled Plaintiff regarding her treatment options, and she agreed to try acupuncture and to have a third Botox injection. (*Id.* at 23-24) She also received a prescription for Hydrocodone. (Doc. 14-14 at 9)

Dr. Stephen Helvie conducted a consultative neurological examination on December 30, 2011. (Doc. 14-11 at 26-27) Dr. Helvie found "no evidence of either acute or chronic lumbar radiculopathy." (*Id.* at 27) Further, Dr. Helvie opined that Plaintiff's nerve conduction studies were "bilaterally normal." (*Id.*)

In January 2012, Plaintiff continued to report that she was "[b]othered by severe pain from fibromyalgia," but she was "doing OK with current psychiatric medications." (Doc. 14-2 at 2, 4) She reported that her acupuncture "seem[ed] to be helping," as were her chiropractic treatments. (*Id.* at 11) However, Dr. Aquino found Plaintiff continued to "exhibit[] tenderness and pain" in her shoulders and back. (*Id.*) Plaintiff received a Fentanyl patch, which she reported was "only partially effective." (Doc. 14-11 at 41)

Dr. Aquino examined Plaintiff in October 2012, and Plaintiff continued to have "decreased range of motion, tenderness and pain" in both her cervical and lumbar spines. (Doc. 14-11 at 76) She told Dr. Aquino that she was stressed and her pain was "exacerbated." (*Id.*) Dr. Aquino "discouraged [a] further increase in pain medication," and encouraged Plaintiff to exercise more regularly. (*Id.*) He gave Plaintiff a "couple of patches" to increase the Fentanyl doses, but told her that she must "decrease [the] Hydrocodone dosing to once a day as needed only" with the additional patches. (Doc. 14-13 at 7)

In November 2012, Plaintiff told Dr. Wong that she was experiencing shortness of breath "off and on…with dizziness and chills" in the mornings. (Doc. 14-11 at 83) She reported that "[e]ach

episode last[ed] for 2-3 minutes before it resolve[d]," and episodes could be triggered upon exertion. (*Id.*)  Upon examination, Dr. Wong found Plaintiff was "[p]ositive for shortness of breath," and she appeared anxious, agitated, and depressed. (*Id.* at 83-84)  Dr. Wong recommended that Plaintiff "lose weight to help her with breathing" and offered her "Ativan or Klonopine to address her anxiety." (*Id.* at 84)  Plaintiff "refuse[d] both medications, and insist[ed] on Valium," stating that Dr. Wong "was not offering her choices and not listening to her request." (*Id*)  Dr. Wong then offered Oxazepam "as a final choice," which Plaintiff accepted. (*Id.*)

Plaintiff "reported [an] increase in overall pain" in June 2013, saying her pain level was a "7/10". (Doc. 14-21 at 41)  Plaintiff said acupuncture and chiropractic treatments were "helping," but she "still ha[d] periods of increase in pain and headaches." (*Id.*)  She showed "decreased range of motion, tenderness and pain" in her cervical and lumbar spines. (*Id.* at 42)  Plaintiff was told to exercise as it was tolerated, and the doctor decreased her prescription for Fentanyl. (*Id.* at 41-42)

In September 2013, Plaintiff saw Dr. Crittle as part of the Kern Pain Management Program. (Doc. 14-22 at 24-25)  Plaintiff described her pain as a "7/10." (*Id.* at 25)  She said she took her husband's Vicodin "maybe once a week," explaining she knew that "she should not be taking his medication, but said she does not know what else to do because 'no one [was] helping [her].'" (*Id.*)  Plaintiff stated that she was "continually frustrated by the care that she receive[d]." (*Id.*)  Dr. Crittle noted Plaintiff seemed "to want a treatment that may not exist," and Plaintiff did "not believe that Kaiser physicians are sincere in their desire to treat her." (*Id.*)  Dr. Crittle discharged Plaintiff from the program, and indicated Plaintiff could "follow-up on an as needed basis should she decide to continue with Kaiser." (*Id.* at 26)

**B.    Administrative Hearing Testimony**

1.    Plaintiff

Plaintiff testified that she had not been employed since April 2009. (Doc. 13-13 at 46)  She said she could use a computer and did so "about four times a week" to "look up information regarding [her] health," check e-mail, and check Facebook. (*Id.* at 51)  Plaintiff said that on a typical day she was "either in bed or laying in a recliner, or alternating between that, and … the floor." (*Id.* at 68)

Plaintiff estimated she was able to walk "[a]bout five minutes" before she needed to stop and

7

rest. (Doc. 13-3 at 55-56) In addition, she believed she could sit in "a comfortable chair… about 15 minutes" before she needed to move around. (*Id.* at 56) Plaintiff explained that after sitting for that period of time, her back, hips, knees, and neck would start to hurt. (*Id.*) She estimated that she spent "[b]etween 15 to 20 hours" each day in bed. (*Id.* at 68)

She reported she visited with her grandchildren, and "might read them a book," or color during the visits. (Doc. 13-3 at 55) Plaintiff said she took her grandchildren to the park, but had difficulty walking and it "hurts [her] body." (*Id.*) Similarly, Plaintiff said walking was difficult while grocery shopping, because she would "stumble… [and] hold onto the basket to keep [her] balance." (*Id.* at 52) Plaintiff said her doctors recommended "[e]xercise, hot and cold baths, stretching," but she could "do absolutely no exercising at all" due to the pain and fatigue it caused. (*Id.* at 69)

Plaintiff said she went to church weekly until approximately June 2013. (Doc. 13-3 at 53) In addition, Plaintiff reported that she went to Bible studies once a week until February 2013. (*Id.* at 54) Plaintiff testified that she stopped attending church and Bible study because "it was difficult for [her] to get there" and "keep still to pay attention to what's being said by the speaker." (*Id.*)

She testified that she also needed to urinate frequently. (Doc. 13-3 at 49-50) She explained that when on a trip to San Diego, she had to ask the person driving to stop every 20 to 30 minutes "at the most," so that she could "use the restroom, … get up and stretch legs, [or] get something to drink." (*Id.* at 49) Plaintiff reported that in an ordinary day around her home, she would have to use the restroom "like ten" times a day, and more than once an hour during the day. (*Id.* at 49-50) She said the problem began in 2004 or 2005, when she remained employed. (*Id.* at 50)

2.   Medical expert

The ALJ called Dr. Thomas Scott to testify regarding Plaintiff's impairments following his review of Plaintiff's medical records found in Exhibits 1 though 19. (Doc. 13-3 at 58-59) Dr. Scott observed that Plaintiff had a nerve conduction study, which "appeared to be normal." (*Id.* at 59) Dr. Scott testified he found "evidence of degenerative disk disease of the lumbar spine" and that Plaintiff was diagnosed with fibromyalgia "based on clinical findings." (*Id.* at 60)

Dr. Scott opined Plaintiff's impairments would not meet any listed impairments, but caused physical limitations. (Doc. 13-3 at 60-61) Specifically, Dr. Scott testified Plaintiff "would have

difficulty in lifting anything heavier than 20 pounds occasionally or ten pounds frequently," "could stand and walk a total of three hours in an eight-hour day," and "sit a total of six hours in an eight-hour day." (*Id.* at 61)  In addition, Dr. Scott opined Plaintiff should be limited to "occasional" postural activities including bending; stooping; crawling; crouching; kneeling; and climbing ladders, scaffolds, ramps, or stairs. (*Id.* at 61-62)  Dr. Scott did not find any environmental limitations. (*Id.* at 62)

Dr. Scott acknowledged he did not consider psychological limitations when he reviewed the record. (Doc. 13-3 at 64)  He said he did not see records indicating Plaintiff "complained of fatigue, headaches, and migraine," because they were not in the exhibits he was given to review. (*Id.* at 63)

### 3. Vocational expert

Vocational expert Jeff Beeman (the "VE") classified Plaintiff's past relevant work —using the *Dictionary of Occupational Titles*[2]—as inventory clerk, DOT 222.387-026; combination administration clerk, DOT 219.362-010; court clerk, DOT 243.362-010; and analyst, DOT 168.267-038. (Doc. 13-3 at 80)  The VE opined that in these positions required up to a medium physical exertion level. (*Id.* at 81)

The ALJ asked the VE "to consider a hypothetical individual, who can never lift more than 30 pounds, occasionally ten to 30 pounds, frequently ten pounds, stand or walk six hours of an eight-hour workday, but no more than 60 minutes continuously, no restrictions in sitting, occasionally push or pull, [and] occasionally stoop." (Doc. 13-3 at 81)  The VE opined, "the lifting [limitations] would eliminate both inventory clerk jobs." (*Id.*)  However, the VE believed the person could perform Plaintiff's past work as a court clerk, both as the job was defined in the *DOT* and as Plaintiff performed it. (*Id.* at 81-82)

Next, the ALJ asked the VE to consider an individual who could "lift or carry occasionally 20 pounds, frequently 10; "stand or walk three hours of an eight-hour workday;" "sit six hours of an eight-hour workday;" "never climb ladders, ropes or scaffolding;" and occasionally climb stairs, "stoop, crawl, crouch, kneel." and climb stairs. (Doc. 13-3 at 82)  The VE opined such a person could also perform Plaintiff's past relevant work as a court clerk. (*Id.*)

---

[2] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).  The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d)(1).

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 209 through her date last insured of March 21, 2013." (Doc. 13-3 at 23)  At step two, the ALJ found Plaintiff's severe impairments included: "fibromyalgia with headaches, low back pain and sleep apnea." (*Id.*)  At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 25)  Next, the ALJ determined:

> the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lift and carry 20 pounds occasionally and 10 pounds frequently; sit 6 hours out of an 8-hour workday; stand and or walk 3 hour[s] out of an 8-hour workday; occasionally climb stairs and ramps, stoop, kneel, crawl and crouch[;] and never climb ladders, ropes or scaffolds.

(*Id.*)  Based upon this RFC, the ALJ concluded Plaintiff "was capable of performing past relevant work as a court clerk." (*Id.* at 29)  Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 30)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny her application for benefits, Plaintiff asserts the ALJ did not identify legally sufficient reasons to reject her credibility. (Doc. 17 at 2-8)  On the other hand, Defendant argues the credibility determination "is supported by substantial evidence and free from reversible legal error." (Doc. 21 at 7, emphasis omitted)

## A.    ALJ's Credibility Analysis

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).  Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 13-3 at 26)  However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely credible . . . ." (*Id.*)  Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding her limitations.

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (the ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when weighing the claimant's credibility).  Here, the ALJ considered a number of factors including Plaintiff's activities, her compliance with treatment, treatment sought and received, and conflicts with the medical record. (*See* Doc. 13-3 at 27-28)

1. Plaintiff's level of activity

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603).  For example, a claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding find of credibility where the claimant alleges she is unable to maintain attention or concentration.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008).  Similarly, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant participates in community activities, gardens, and exercises. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).  However, an ALJ must make a specific finding that the daily activities are transferable to a workplace to refute a claimant's allegations of disability. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2008).

In this case, the ALJ noted that "despite her alleged limitations," Plaintiff "attends church, Bible study, dines out, takes her granddaughter to the park and helps with many household chores." (Doc. 13-3 at 28-29)  Significantly, Plaintiff testified that she stopped attending church and Bible study on a

weekly basis. (*See* Doc. 13-3 at 53-54) There is no indication that Plaintiff engaged in the activities identified by the ALJ on a *daily* basis. Regardless, the Ninth Circuit determined that the mere fact a claimant engages in normal daily activities "does not any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). In addition, the Court opined, "Daily household chores . . . are not activities that are easily transferable to a work environment." *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th Cir. 2008).

Moreover, the ALJ failed to find that Plaintiff spent a "substantial" part of her day engaged in these activities or that Plaintiff's activities could be transferred to a work setting. As a result, Plaintiff's level of activity was not clear and convincing evidence to discount her credibility. *See Orn*, 495 F.3d at 639 (the ALJ erred rejecting a claimant's credibility where his "activities [did] not meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations"); *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting). Thus, Plaintiff's activities of daily living do not support the adverse credibility determination.

2. Compliance with treatment

The Regulations caution claimants that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. §§ 404.1530(a), 416.930(a). If a claimant fails to follow the prescribed treatment without an acceptable reason, the Commissioner "will not find [the claimant] disabled." 20 C.F.R. §§ 404.1530(b), 416.930(b). Accordingly, the Ninth Circuit determined, "[A]n unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603. Therefore, noncompliance with a prescribed course of treatment is clear and convincing reason for finding a claimant's subjective complaints lack credibility. *Id.; see also Bunnell*, 947 F.2d at 346.

Here, the ALJ indicated "there are numerous citations in the medical record which document [Plaintiff's] noncompliance with medication treatment and admitted to poor eating habits, which is not what [the ALJ] would expect from someone as disabled as the claimant claims." (Doc. 13-3 at 28, citing, e.g., Exh. 21F, p. 778 [Doc. 14-22 at 25]; Exh. 3E, p. 2 [Doc. 13-7 at 14]; Exh. 9F, p. 89 [Doc.

13-20 at 23]) Notably, the ALJ identifies only two instances in the medical record where Plaintiff admitted she was taking her husband's pain medication. (*See* Doc. 13-20 at 23; Doc. 14-22 at 25) On both occasions, Plaintiff reported she was doing so because her pain medication was not sufficient. Specifically, in October 2011, Plaintiff informed Dr. Benjamin that she was relying "on her husband's hydrocodone/APAP in order to find some relief from the diffuse myalgia and continual headaches," after which Dr. Benjamin recommended Plaintiff receive a narcotic medication such as Fentanyl patches—for which she received a prescription—and to try acupuncture. (*See* Doc. 13-20 at 23, Doc. 14-14 at 9) Thus, Plaintiff explained the reason for her noncompliance to the physicians, who adjusted her medication. Similarly, in 2013 Plaintiff said she "sometimes [took] her husband's Vicodin... maybe once a week" because she "did not know what else to do" for her pain. (Doc. 14-22 at 25)

Significantly, there is no indication from the record that failure to follow the prescribed treatment caused an exacerbation of Plaintiff's symptoms, or that compliance with the treatment would restore her ability to work. Similarly, there is no indication that an improvement in Plaintiff's diet, which her husband identified as "poor" (Doc. 13-7 at 14), would restore her ability to work. Indeed, the ALJ does not identify any evidence showing that physicians recommended Plaintiff change her diet, or findings that her diet negatively impacted her physical abilities. Consequently, this factor does not support the adverse credibility determination. *See* 20 C.F.R. §§ 404.1530(a), 416.930(a).

### 3. Treatment requested

The Ninth Circuit determined that when a claimant engages in drug-seeking behavior, such conduct may support an adverse credibility determination. *See Gray v. Comm'r of the Soc. Sec. Admin.*, 365 Fed. App'x. 60, 63 (9th Cir. 2010) (it was a clear and convincing reason to reject a claimant's reports of severe pain when "numerous physicians commented that [the claimant's] claims of pain appeared to be the result of drug-seeking"). Thus, this Court determined if substantial evidence supports a finding that a claimant engaged in drug-seeking behavior, the finding "further undermines her credibility regarding her symptoms." *Halford v. Astrue*, 2011 U.S. Dist. LEXIS 37241, at * 24 (E.D. Cal. Mar. 29, 2011)

Here, the ALJ stated:

> It is important to note that the claimant alleged shortness of breath with dizziness and chills. She was told that she needed to follow up with Psychiatry to address her anxiety

and insomnia.  In the meantime, she was offered Ativan or Klonopin to address her anxiety symptoms, which she refused and insisted on Valium (Exhibit 19F/55).  Indeed, it is possible that the claimant may not have had any shortness of breath at all – that she may have alleged so to feed an addiction to pain medication.  The greater weight of the evidence leads me to no other reasonable conclusion especially in cases like this where the objective evidence is inconsistent with the allegations

(Doc. 13-3 at 29)

Notably, the ALJ does not cite any medical evidence to support his conclusions, such as the opinion of a physician that Plaintiff was addicted to pain medication.  Rather, the ALJ offers nothing more than his mere speculation that Plaintiff requested Valium because she was addicted to pain medicine.  Such speculation by the ALJ does not constitute substantial evidence, let alone clear and convincing evidence.  *See Edlund v. Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001) (an ALJ's "concerns and speculation" regarding a claimant's substance abuse did not constitute substantial evidence supporting the decision).  Given the lack of evidence regarding the treatment requested—or any findings by a physician that Plaintiff exhibited drug-seeking behavior— this factor does not support the adverse credibility determination.

4.      Objective medical record

As discussed above, the ALJ purported to consider Plaintiff's level of activity, the treatment she requested, and her failure to comply with treatment.  However, the findings were inadequate to support the adverse credibility determination.  The ALJ also considered conflicts between Plaintiff's testimony and the objective medical evidence (Doc. 13-3 at 28), but this factor, standing alone, is not sufficient to support an adverse credibility determination.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence").

In 1984, Congress amended the statutes governing disability to address allegations of pain.  *See Bunnell*, 947 F.2d at 347; 42 U.S.C. § 423(d)(5)(A).  With the amendment, "Congress clearly meant that so long as the pain is associated with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability."  *Howard v. Heckler*, 782 F.2d 1484, 1488 n.4 (9th Cir. 1986).  The Ninth Circuit observed,

[D]espite our inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from

working. Because pain is a subjective phenomenon, moreover, it is possible to suffer disabling pain even where the degree of pain, as opposed to the mere existence of pain, is unsupported by objective medical findings.

*Fair*, 885 F.2d at 601. Therefore, an ALJ may not base an adverse credibility determination solely upon the medical evidence related to discount claims of pain. *Id.; see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the "lack of medical evidence cannot form the sole basis for discounting pain testimony"); 1996 SSR LEXIS 4, at *2-3 (a claimant's statements "may not be disregarded solely because they are not substantiated by objective medical evidence"). As a result, the ALJ's citations to the medical record alone do not support the decision to reject Plaintiff's testimony regarding the extent and limiting effects of her pain.

5.     Conclusion

For the reasons set forth above, the ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958.

**B.     Remand is Appropriate in this Matter**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the District Court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed when no useful purpose would be served by further administrative proceedings, or where the record was fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony

regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834.

However, courts retain flexibility in crediting testimony as true. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanding for further determinations where there were insufficient findings as to whether the plaintiff's testimony should be credited as true). A remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain with sufficient specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints . . ."). Here, the record is insufficient to determine whether Plaintiff is disabled if the limitations to which she testified were adopted. Consequently, the matter should be remanded for the ALJ to re-evaluate the evidence.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the ALJ failed to articulate clear and convincing reasons supported by substantial evidence in the record to reject Plaintiff's subjective complaints. As a result, the Court should not uphold the administrative decision. *See Sanchez*, 812 F.2d at 510.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Teresa Ursua-Holmes and against Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **September 22, 2016**          /s/ Jennifer L. Thurston
                                         UNITED STATES MAGISTRATE JUDGE